JOSEPH H. DUBOIS *vs.* ATLANTIC CORPORATION.

Suffolk.   December 2, 1947. — March 11, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, WILKINS, & SPALDING, JJ.

*Deceit. Damages,* For tort. *Evidence,* Of damage, Receipt, Cumulative
   evidence. *Practice, Civil,* New trial.

On evidence that the defendant induced the plaintiff to sign a blank bill
   of sale through a false representation that he intended to insert therein,
   as the subject of the sale, only a motor tractor, whereas it was his
   intention to include also a trailer, property of the plaintiff, and that
   he did so include the trailer, a verdict for the plaintiff was warranted
   in an action for deceit resulting in loss of the title to the trailer.
Upon an issue, at the trial of an action for deceit, whether the plaintiff
   had been induced to sign in blank a chattel mortgage by false repre-
   sentations of an agent of the mortgagee that it would be filled in as a
   mortgage of only a tractor, rather than as a mortgage of both a tractor
   and trailer, a loan receipt signed by the mortgagor, reciting that the
   mortgage was of both the tractor and the trailer, was not conclusive
   against him, but was merely evidence.
No abuse of discretion appeared in the denial of a motion by the defend-
   ant for a new trial of an action for deceit, where, although it was diffi-
   cult for this court to discover how the jury reached their conclusion
   or why the trial judge allowed the verdict to stand, this court on the
   printed record could not determine that no trial judge honestly and
   intelligently could have allowed the verdict to stand.
No error appeared in the exclusion at a trial of a letter written by a
   witness which was apart from the main issue and which merely sup-
   ported testimony already given by him.
At the trial of an action for deceit in inducing the plaintiff to sign a bill
   of sale of a trailer and thereby ultimately causing his loss of the trailer,
   evidence was wrongly admitted to prove loss of profits from the
   plaintiff's nonuse of the trailer during a period when the plaintiff had
   abandoned possession thereof, not because of the bill of sale; the
   measure of his damages was the value of the trailer, which was all
   that he lost through its being included in the bill of sale.

TORT.   Writ in the Superior Court dated May 24, 1945.
The action was tried before *Baker,* J.

*J. W. Cussen,* for the defendant.

*M. Rosenthal,* for the plaintiff.

WILKINS, J.   The one count remaining in this action

of tort is for deceit, [1] and alleges that the defendant induced the plaintiff to sign in blank, on one occasion, a form of mortgage and, on a later occasion, a bill of sale, by falsely representing that it intended to fill in the instruments so that, when completed, they would be a mortgage and a bill of sale of the plaintiff's tractor; that the defendant thereafter included in the instruments not only the tractor, but also the plaintiff's trailer; and that in consequence the plaintiff lost his "property" and the use thereof, and sustained loss of business and profits. The answer is a general denial. The jury returned a verdict of $2,000 for the plaintiff. The defendant's exceptions are to rulings on evidence, to the denial of its motion for a directed verdict, to the denial of its requests for instructions, and to the denial of its motion for a new trial.

The only witness on his own behalf was the plaintiff, who testified on direct examination as follows: The defendant previously had financed a tractor and a trailer for the plaintiff. The tractor burned in September, 1944, and in November one Epstein, president and treasurer of the defendant, took care of the settlement of the fire loss. Epstein received the check for the insurance, and had the plaintiff indorse it without permitting him to see its face. The plaintiff decided to purchase a new tractor, which the defendant was to finance, from Allied Freightways, Inc. Epstein said that the plaintiff would have a balance of $500 "after clearing off that deal." The plaintiff discussed the purchase of the tractor with one Cholfin at Allied Freightways, and reported to Epstein that the amount asked, $4,500, was too much. Epstein said he would see what he could do to bring the price down. About November 18 he informed the plaintiff that he could do nothing, and that the asking price stood. When asked by Epstein, the plaintiff assented to signing a mortgage. Epstein went to his cabinet and pulled out a blank mortgage form with "just print on it." Epstein told the plaintiff to sign the mortgage and the note, and said that "he would have the girl fill both papers when she came

---

[1] A second count for conversion was waived.

in, for the mortgage for the tractor." "So far as I know I signed both pieces of paper." There was no talk about the trailer.

Two or three weeks later the plaintiff told Epstein that he was having trouble with the new tractor. Epstein advised the plaintiff to see Cholfin and to learn what arrangements could be made about returning it or receiving back his money. The plaintiff saw Cholfin and reported to Epstein that Cholfin would do nothing. The plaintiff told Epstein that he did not want anything more to do with the tractor, and that he had no place to park the trailer, and asked where he could leave it. Epstein told him to leave it at the Allied Freightways garage, and to pick it up at any time he wanted it. The plaintiff left the tractor and the trailer on East Dedham Street in front of the garage, but not because of any bill of sale. The plaintiff had paid Epstein $100 on account of the mortgage on December 8.

In January, 1945, the plaintiff went to Epstein's office. Epstein asked him to sign a bill of sale "for the tractor" to give it back to Allied Freightways, and the plaintiff agreed. Epstein presented a blank bill of sale, which the plaintiff signed, saying "the deal between him and I was ended."

In March, 1945, the plaintiff arranged to buy a tractor elsewhere. He went to Allied Freightways, but did not see the trailer. He then asked Epstein where it was. Epstein informed him that he had no trailer, as he had given Epstein a bill of sale for it. This the plaintiff denied, asserting that he had signed a bill of sale for the tractor only, and that there was no mortgage on the trailer. This Epstein in turn denied.

The trailer was never returned to the plaintiff. In November, 1944, and January, 1945, its value was $3,000. From January until March, 1945, the date of the acquisition of another trailer, "he was without the equipment of a trailer for about ten weeks." Until he acquired one he was unable to pull any loads. Prior to January 1 when he had his trailer in operation, he had capacity loads.

From discussion with about fifteen or twenty individuals in the same line of business using a tractor and a trailer of

approximately the same size, he knew that "during three or four months preceding 1945" they averaged about the same amount of money as he did. The plaintiff was asked, "Now, will you give us what the average profit is per week for the type of business of a man operating the same way as you do with a tractor and a trailer for that period in the last of 1944 and the first of 1945?" Subject to the defendant's exception, the plaintiff answered, "I would say an average of between seventy-five and one hundred dollars a week."

On cross-examination the plaintiff testified: Around June or July, 1944, the plaintiff bought out his partner, one Puccia, and acquired the trailer and the tractor. The partnership began in May, and previously Puccia had purchased the trailer on conditional sale. The plaintiff assumed payments on both tractor and trailer, but did not know how much was due. Puccia said he did not know. The plaintiff then made payments to the defendant until the tractor burned. The check was the only paper pertaining to the insurance he knew of signing. He did not know whether he signed a proof of loss. He did not know whether the insurance company settled for $1,300, and never heard of that figure. He signed a "release" dated November 17, 1944, acknowledging receipt from The Employers' Fire Insurance Co. of $1,300 in full satisfaction of the fire loss. The "release," which was admitted in evidence, the plaintiff signed without reading. It purported to be witnessed by F. P. Swain, but the plaintiff did not know him. Also on November 17 the plaintiff signed a proof of loss to the insurance company. The proof of loss was admitted in evidence and gave the "whole insurance" as $3,150 and the "whole loss" as $1,300. The plaintiff signed without reading the proof of loss.

The following were admitted in evidence: (1) A mortgage, dated November 18, 1944, from the plaintiff to the defendant in the amount of $5,171 on a 1941 diesel motored tractor and a 1941 trailer, recorded in the office of the city clerk of Boston on November 20, 1944, and bearing the indorsement, "Having received full payment and satisfaction of

the within mortgage, the same is hereby discharged, Signed and sealed March 2, 1945, Atlantic Finance Corp. by Rubin Epstein, treasurer." (2) A mortgage note, dated November 18, 1944, from the plaintiff to the defendant in the amount of $5,171, payable in weekly instalments of $100 beginning December 1, 1944, the entire amount to be paid in fifty-one weeks. The note was stamped, "Paid 3–2–1945. Atlantic Finance Corporation by G. P.," and on the reverse side bore the indorsement "January 30, 1945, Allied Freightways, Inc., I. Cholfin, president." (3) A bill of sale, dated January 30, 1945, from the plaintiff to Allied Freightways, Inc., of the tractor and the trailer, which recited that they were free of all encumbrances except a balance of $5,071 to the defendant under a chattel mortgage.

On further cross-examination the plaintiff testified: The mortgage, the note, and the bill of sale were signed in blank, and were the only papers he remembered signing in blank. When asked what was the balance after the $1,300 was paid by the insurance company, he answered, "The amount that I think was due on it so far as I know, and it was told by the Atlantic Finance, that balance, that was cleared up, so far as we were concerned, that cleared the deal up."

The plaintiff identified his indorsement on a check of the defendant, dated November 18, 1944, for $996 payable to the plaintiff, which had been deposited in the defendant's bank account on November 20, 1944. The plaintiff testified that he remembered signing the check, "but so far as receiving it, it might have been passed there at the office, that is all he can tell." Concerning whether a balance of $996 was included in the new transaction, he testified, "Not that I know of. Not from what I was told"; that this was the first time that he heard that there was such a balance; and that it was about January 1, 1945, when "he left the equipment in front of the Allied Freightways garage on East Dedham Street, just left it there and walked away."

The following was admitted in evidence: "Loan Receipt Received from the Atlantic Finance Corporation Forty four hundred ninety six and 00/100 Dollars in full payment

of note for Fifty one hundred seventy one and 00/100 Dollars, dated Nov. 18, 1944 and payable weekly, which note is secured by a mortgage on certain 1941 Mack Tractor and 1941 Trailmobile Semi Trailer now situated at Boston, Mass. Remarks: . . . Witness my hand and seal this 18th day of Nov., 1944. Witness: G. Pollack    Joseph H. DuBois d/b/a Blue Bird Transportation Co." The plaintiff testified that he signed the loan receipt, but did not remember it. Asked whether it was filled in in that way when he signed, he answered, "Not that I know of. I don't remember it."

The plaintiff testified that the second tractor cost $4,500, and there was paid down $500 of the money received by the defendant from the insurance company. He identified his indorsement on a check for $3,500, dated November 18, 1944, of the defendant to the plaintiff, and indorsed by the plaintiff to Allied Freightways, Inc. "I don't recall this check. . . . The second tractor I understood was $4,500 or whatever the amount is on the check. I don't know what is supposed to be on there but I know I signed the check and so far as I know the money was supposed to go to the Allied Freightways, $4,500. If the check was $3,500 I don't know about that."

The plaintiff further testified on cross-examination: About December 8, 1944, he discovered that he owed the defendant $5,171, but could not "break down" the amount. He owed Allied Freightways $4,500 on the tractor. The "rest of it he imagines . . . is a finance charge and that is the extent of his knowledge of the deal with Allied Freightways." He had no talk with Epstein as to the amount of the finance charge. He told Epstein that he owed Allied Freightways $4,500 for the second tractor. In November he had one Glazer, an insurance broker, insure the second tractor and the trailer for fire and theft. He had Glazer send to the defendant "Not the policy but the binder which covered the tractor and trailer." As to whether the insurance was to include the defendant on both tractor and trailer, "it was supposed to be all on one policy but the trailer was not supposed to be for the defendant," and he so instructed

Glazer. He knew that the binder was furnished, but never saw it. He thought the proof of loss was signed in the insurance company office. He knew "it was supposed to be a release of the tractor," and when he signed the proof of loss he also signed a release. A few days after leaving the tractor and the trailer he returned to Allied Freightways garage, and was told that the equipment was in the Pontiac Street garage. He passed the Pontiac Street garage on the way home, and saw the trailer outside but not the tractor. The plaintiff never paid the defendant anything on the mortgage on his "second tractor and trailer."

Frank P. Swain, called as a witness by the defendant, testified that he was an adjuster for The Employers' Fire Insurance Company; that in 1944 he had negotiations with the plaintiff regarding a fire loss; that he talked with the plaintiff, once at the plaintiff's house, and once at the office of the insurance company, and settled the loss with the plaintiff for $1,300; that the plaintiff called at the office of the insurance company accompanied by Epstein, and after discussion agreed to $1,300 in full settlement; that the release was signed by the plaintiff and Epstein; that he witnessed the plaintiff's signature at the office of the insurance company; that he gave the company's check for $1,300 on November 17, 1944; and that the release and the proof of loss came from his files.

Wilfred D. Glazer, called as a witness by the defendant, testified that he was an insurance broker, and on January 8, 1945, placed fire and theft insurance on a tractor and a trailer for the plaintiff; that at that time he issued a binder to the plaintiff, payable to the defendant in the respective amounts of $3,500 and $1,700; and that he mailed the binder to the defendant on instructions from the plaintiff. The judge excluded, subject to the defendant's exception, a letter, dated January 8, 1945, from Glazer to the defendant, and its enclosure, the binder, which were in substance to the same effect as Glazer's oral testimony.

Mrs. A. Pollack Lewe, called on behalf of the defendant, testified that her maiden name was Pollack; that in 1944 and 1945 she was employed by the defendant as secretary

and bookkeeper; that she typed the mortgage, the note, the bill of sale, and the loan receipt; that she had the plaintiff sign them all; that the body of each instrument was made up before the plaintiff signed; that she signed each instrument as witness; that she typewrote the $3,500 check, and the indorsement to Allied Freightways, Inc., was done at the same time as the other typewriting; and that the check was given to Allied Freightways.

Rubin Epstein, called as a witness by the defendant, testified that he was president and treasurer of the defendant; that in April, 1944, the defendant held a conditional bill of sale on a tractor and a trailer belonging to Puccia; that the plaintiff became interested in the equipment; that in September, 1944, he talked with the plaintiff about the damage to the tractor by fire; that there was $2,296 due from the plaintiff; that he did not participate in the adjustment of the loss other than that he was present to sign a release when the $1,300 check was made out and paid over; that the check was handed to the plaintiff and he asked the plaintiff to indorse it in the office of the insurance company; that he "applied the $1,300 to the plaintiff's account and a balance of $996 was left"; that about this time the plaintiff told him that the plaintiff wished to acquire from Allied Freightways a tractor for which they were asking $4,500 and wanted the witness to have Allied Freightways lower the price and accept the burned tractor in part payment; that he succeeded in having Cholfin accept $3,500 together with the burned tractor, which Cholfin took at $500; that the plaintiff and he agreed to unite the $996 balance on the old account and the $3,500 in a new account of $4,496 with a finance charge, making the new note $5,171, payable $100 weekly; that "Miss Pollack" made up the papers and had the checks indorsed; that all the typing in the mortgage and the note was done before signing; that "a couple of weeks later" the plaintiff told the witness that the tractor was not what he wanted and that he was going back to Cholfin with it; that on November 18, 1944, the plaintiff's old account was paid up by the new loan, and after the papers were signed he told the

plaintiff that nothing was due on the old account; that he told the plaintiff he would look to the plaintiff for payment for the tractor and the trailer; that the plaintiff made one payment on December 8, 1944, and kept using the tractor; that later the plaintiff said that the tractor was giving him trouble, and he would like to dispose of it; that he told the plaintiff to try to sell it and pay the balance of $5,071; that the plaintiff could not do it and toward the end of December took the tractor and the trailer to Allied Freightways; that thereafter the insurance was cancelled, and he asked the plaintiff for a new policy, which he received early in January, 1945; that he told the plaintiff he would foreclose the mortgage if the defendant was not paid, and that Allied Freightways would probably pay off the note and mortgage; that Allied Freightways agreed "to take it over and pay the balance"; that he gave instructions to make out a bill of sale to Allied Freightways and "that cleared the plaintiff"; that the plaintiff signed the bill of sale; that Allied Freightways paid off the balance; that the mortgage included the trailer; and that the plaintiff never claimed otherwise.

1. There was no error in the denial of the motion for a directed verdict. The defendant concedes that there was evidence warranting a finding that the mortgage, the note, and the bill of sale were signed in blank and fraudulently filled in so as to include the trailer. If the defendant misrepresented its intention as to filling in the blanks, it was a misrepresentation of a material fact, which could be made the foundation of an action for deceit. *Feldman* v. *Witmark*, 254 Mass. 480, 481. *Commonwealth* v. *McKnight*, 289 Mass. 530, 546–547. *Schleifer* v. *Worcester North Savings Institution*, 306 Mass. 226, 228. See *Smith* v. *Jagoe*, 172 Mass. 538, 542; *Kidder* v. *Greenman*, 283 Mass. 601, 610. Restatement: Torts, §§ 530, 544.

The defendant urges, however, that there was no evidence of damage, without which an action for deceit must fail, as deceit is not an absolute wrong for which the injured person may recover at least nominal damages. *Brackett* v. *Perry*, 201 Mass. 502, 504. *Pearl* v. *Wm. Filene's Sons Co.* 317

Mass. 529, 532. The plaintiff had the burden of proving that there was some damage. *Goodwin* v. *Dick*, 220 Mass. 556. *Connelly* v. *Bartlett*, 286 Mass. 311, 315. *National Shawmut Bank* v. *Johnson*, 317 Mass. 485, 491. He suffered no harm merely by reason of the mortgage, as this was discharged and the note was stamped paid in full before the action was brought.

The defendant contends that the plaintiff likewise has not shown that he was damaged by reason of the bill of sale, as it does not appear that Allied Freightways ever took possession of the trailer, or that the plaintiff was deprived of it. The defendant argues that the plaintiff left his trailer in front of the Allied Freightways garage, and that the only testimony as to its later whereabouts was that a few days afterwards it was at the Pontiac Street garage. But the jury could have found that in March, 1945, the defendant's treasurer told the plaintiff that he had no trailer, as he had given a bill of sale of it; that Allied Freightways had paid the defendant the amount of the mortgage note; and that the defendant had discharged the mortgage on March 2. They could have found that the defendant had delivered the bill of sale, which improperly included the trailer, to Allied Freightways, which was named therein as grantee. The present action of tort for deceit has proceeded upon the ground that the bill of sale was affirmed, that thereby title to the trailer passed to Allied Freightways, and that thus the plaintiff lost title to the trailer. *Whiteside* v. *Brawley*, 152 Mass. 133, 134. *Whiting* v. *Price*, 172 Mass. 240, 243. *Patch* v. *Cashman*, 244 Mass. 378, 379. *Forman* v. *Hamilburg*, 300 Mass. 138, 142. *Thibault* v. *Lalumiere*, 318 Mass. 72, 75.

The loan receipt, reciting that the note was secured by mortgage on both the tractor and the trailer, is not conclusive against the plaintiff. As a receipt, its recitals could be disputed. *Rosenblatt* v. *Holstein Rubber Co.* 281 Mass. 297, 301. *Campbell* v. *Boston*, 283 Mass. 365, 368. Wigmore, Evidence (3d ed.) § 2432.

2. What we have said shows that there was no error in the denial of the defendant's requests, detailed elaboration of which is unnecessary.

3. We observe no abuse of discretion in the denial of the motion for a new trial. Viewing the unemotional record, it is hard to see how the jury found for the plaintiff, or the judge allowed the verdict to stand. The plaintiff's case proceeded in the face of many documents, some of which he admitted, or asserted, that he signed without reading. We are not, however, the arbiters of fact. What is more, lacking observation of the witnesses, we cannot say "that no conscientious judge, acting intelligently, could honestly have" denied the motion or believed that the jury might properly have found that the actual course of events was as the plaintiff testified. *Davis* v. *Boston Elevated Railway*, 235 Mass. 482, 502. *Bartley* v. *Phillips*, 317 Mass. 35, 43–44.

4. There was no error in the exclusion of the letter and the binder written to the defendant by the plaintiff's insurance broker. Evidence of the matters contained in them, which were apart from the main issue, had been introduced by the defendant. The judge was not bound to receive further evidence from the same witness to support what he had already testified positively of his own knowledge. *McCooe* v. *Dighton, Somerset, & Swansea Street Railway*, 173 Mass. 117, 118. *Sanderson* v. *Carroll*, 238 Mass. 142, 145. *Commonwealth* v. *Kosior*, 280 Mass. 418, 421. *Commonwealth* v. *Lammi*, 310 Mass. 159, 164.

5. It was error to admit the plaintiff's testimony of the profits of other owners of tractors and trailers. From January to March, 1945, the plaintiff, through no fault of the defendant, operated no tractor. The plaintiff testified that he had left it in front of the Allied Freightways garage not because of any bill of sale; that he was having trouble with it; and that he did not want anything more to do with it. These statements of his purpose and feelings were binding upon him. *McFaden* v. *Nordblom*, 307 Mass. 574. *McCarthy* v. *Brockton National Bank*, 314 Mass. 318, 327. *Meunier's Case*, 319 Mass. 421, 424. The measure of his damages is the value of the trailer, which is all he lost through its being included in the bill of sale. *Morse* v. *Hutchins*, 102 Mass. 439, 440. *Thomson* v. *Pentecost*, 206 Mass. 505, 512, *S. C.* 210 Mass. 223. *Kerr* v. *Shurtleff*, 218

Mass. 167, 173. *Piper* v. *Childs*, 290 Mass. 560, 561–562. *McCarthy* v. *Brockton National Bank*, 314 Mass. 318, 328. Restatement: Torts, § 549. See *Anderson* v. *Rubin*, 286 Mass. 361. There is no merit in the plaintiff's contention that the amount of the verdict does not indicate that this evidence was believed. In addition to the evidence of the plaintiff that the trailer was worth $3,000, another witness testified to a value of between $1,450 and $1,800.

6. The defendant's exceptions are sustained. We think that justice requires that the new trial should be on all the issues in the case, and should not be confined to the question of damages.

*So ordered.*