Roger BURTEN d/b/a Rainy Day
Games & Toys, et al., Plaintiffs,
Appellants,

v.

MILTON BRADLEY COMPANY,
Defendant, Appellee.

No. 84–1746.

United States Court of Appeals,
First Circuit.

Argued March 6, 1985.

Decided May 30, 1985.

John P. Barylick, Providence, R.I., with
whom Wistow, Barylick & Bruzzi, Prov-
idence, R.I., was on brief, for plaintiffs,
appellants.

Gael Mahony, Boston, Mass., with whom
John A.D. Gilmore, Bruce E. Falby and Hill
& Barlow, Boston, Mass., were on brief, for
defendant, appellee.

Before COFFIN and TORRUELLA, Cir-
cuit Judges, and RE,* Judge.

* Chief Judge, of the United States Court of Inter-    national Trade, sitting by designation.

COFFIN, Circuit Judge.

This case concerns the clarity of a disclosure agreement between appellants, independent toy inventors, and the Milton Bradley Co., a toy manufacturer, and whether the parties intended by their disclosure agreement to preclude the formation of a confidential relationship. Plaintiffs-appellants Roger Burten and Allen Coleman claim that appellee Milton Bradley, when entrusted with a prototype of an electronic board game they designed, misappropriated their ideas and their technology. Reading the disclosure agreement signed by appellants to be legally dispositive of the misappropriation allegations, the district court overturned the jury verdict entered for appellants and granted appellee's motion for judgment notwithstanding the verdict. *Burten v. Milton Bradley Co.,* 592 F.Supp. 1021 (D.R.I.1984).

*Facts*

"Triumph" is the name of an electronic board game invented by Coleman and Burten which they had hoped to sell to Milton Bradley. Milton Bradley has a policy to consider game ideas only from inventors known to it, and only after inventors agree to sign its "Disclosure Record" form. Appellants willingly signed Milton Bradley's standard disclosure agreement which ostensibly delineates the parties' rights pending evaluation of the product, and Triumph was accepted for review. The disclosure agreement contained language to the effect that the submission was undertaken voluntarily, that no relationship to Milton Bradley was to be implied from the company's willingness to review the idea, that Milton Bradley assumed no obligation to accept the product, and that the disclosing party was to retain all rights under United States patent laws. The disclosure agreement also authorized Milton Bradley to reproduce for its records all material submitted.

Appellants failed to secure a contract on the first review of Triumph, so they modified the game and resubmitted it to Milton

Bradley after signing new disclosure agreements. Triumph again was rejected by Milton Bradley. This should have been the end of the story, but approximately one year later, appellants discovered that Milton Bradley was marketing a new electronic board game under the name of "Dark Tower". Because appellants believed that Dark Tower contained significant structural and design similarities to Triumph, they brought this action for trade secret misappropriation.

Appellants' amended complaint alleged fraud, breach of contract and two counts of trade secret misappropriation, one based on common law tort and the other on Mass. Gen.Laws Ann. ch. 93, § 42, which essentially codifies the common law.[1] At the close of appellants' case, the fraud count was withdrawn, the court directed a verdict for Milton Bradley on the contract claim, and denied without prejudice Milton Bradley's motion for a directed verdict on the misappropriation counts. After the lengthy trial was concluded, the jury returned a general verdict for Coleman and Burten in the amount of $737,058.10 for royalties based on the Dark Tower profits. Milton Bradley moved for judgment notwithstanding the verdict, and the district court, after a meticulous survey of the cases, which it recognized posed a "surprisingly close question", set aside the verdict. *Burten v. Milton Bradley,* 592 F.Supp. at 1031. We share the court's view of the closeness of the question, but feel constrained to allow the verdict to stand.

*Analysis*

■ In Massachusetts the law of torts affords limited protection to the owner of a trade secret for the misappropriation of his ideas. *Atlantic Wool Combing Co. v. Norfolk Mills, Inc.,* 357 F.2d 866, 869 (1st Cir.1966) (diversity case discussing Massachusetts and Rhode Island law). The essence of the wrong is generally "the breach of the duty not to disclose or to use without permission confidential information ac-

---

**1.** The parties stipulated at trial to submit only the common law claim to the jury with the understanding that the judgment entered on

that count would apply as well to the statutory count. The parties also agreed that Massachusetts law governs this diversity action.

quired from another." *Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 165, 385 N.E.2d 1349, 1354 (1979) (*Jet Spray II*); *see Junker v. Plummer,* 320 Mass. 76, 80, 67 N.E.2d 667 (1946). In order to successfully establish a cause of action for misappropriation, therefore, a plaintiff must show that he or she shared a confidential relationship with the defendant, possessed a trade secret,[2] disclosed it to the defendant, and that the defendant made use of the disclosure in breach of the confidence reposed in him. *See generally* Restatement of Torts § 757 (1939); R. Milgrim, *Trade Secrets* § 7.07[1] (1984); *see also Jet Spray II,* 377 Mass. at 166, 385 N.E.2d at 1354.

■ A confidential relationship generally arises by operation of law from the affiliations of the parties and the context in which the disclosures are offered. Milgrim, *Trade Secrets* § 4.03 at 4–12; *Pachmayr Gun Works, Inc. v. Olin Mathieson Chemical Corp., etc.,* 502 F.2d 802, 808 (9th Cir.1974); *Kearns v. Ford Motor Co.,* 203 U.S.P.Q. 884, 888 (E.D.Mich.1978). Where the facts demonstrate that a disclosure was made in order to promote a specific relationship, e.g., disclosure to a prospective purchaser to enable him to appraise the value of the secret, the parties will be bound to receive the information in confidence. *Cloud v. Standard Packaging Corp.,* 376 F.2d 384, 388–389 (7th Cir.1967), cited in *Pachmayr Gun Works,* 502 F.2d at 808; *Heyman v. AR. Winarick, Inc.,* 325 F.2d 584, 587 (2d Cir.1963). *See* Milgrim, *Trade Secrets* § 4.03. As the district court indicated, a confidential relationship typically will be implied where disclosures have been made in business relationships between employers and employees, e.g., *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 282 N.E.2d 921 (1972) (*Jet*

*Spray I*), purchasers and suppliers, e.g., *Curtiss-Wright Corp. v. Edel Brown Tool & Die Co.,* 381 Mass. 1, 407 N.E.2d 319 (1980), or prospective licensees and licensors, *see* Annot., 9 A.L.R.3d 665 (1966). *Burten v. Milton Bradley,* 592 F.Supp. at 1031; Hutter, *Trade Secret Misappropriation: A Lawyer's Practical Approach to the Case Law,* 1 W. New Eng.L.Rev. 1, 24–25 (1978).

■ The formation of a confidential relationship imposes upon the disclosee the duty to maintain the information received in the utmost secrecy; the unprivileged use or disclosure of another's trade secret becomes the basis for an action in tort. Restatement of Torts § 757(b):

"If the defendant has acquired the information as a result of a confidential relationship which he enjoyed with the plaintiff, and, if the defendant has used the information without the permission of the plaintiff, then the defendant's use of the information is wrongful, and the defendant is liable to the plaintiff in damages...." *Jet Spray II,* 377 Mass. at 168, 385 N.E.2d at 1355.

■ An implied confidential relationship can be defeated, however, if the disclosing party voluntarily conveys a trade secret to another without limitation upon its use, *see J. Irizarry y Puente v. President and Fellows of Harvard College,* 248 F.2d 799 (1st Cir.1957) (construing Massachusetts law); *Wanberg v. Ocean Spray Cranberries, Inc.,* 194 U.S.P.Q. 350 (N.D.Ill.1977) (the court construed Massachusetts and Rhode Island law and found no confidential relationship because the plaintiff unilaterally submitted an idea to defendant for consideration); *Bowen v. Yankee Network, Inc.,* 46 F.Supp. 62 (D.Mass.1942); *Laughlin Filter Corp. v. Bird-Machine Co.,* 319 Mass. 287, 65 N.E.2d 545 (1946); *Chadwick*

---

**2.** Following the majority of states, Massachusetts has endorsed the definition of a trade secret found in the Restatement of Torts § 757:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or

use it. It may be ... a pattern for a machine or other device, or a list of customers.... The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.,* 357 Mass. 728, 736, 260 N.E.2d 723 (1970).

*v. Covell*, 151 Mass. 190, 23 N.E. 1068 (1890), or if the parties, by agreement, expressly disclaim such a relationship, Milgrim, *Trade Secrets* § 4.03; *see e.g., Kearns v. Ford Motor Co.*, 203 U.S.P.Q. 884. Apparently the latter is what Milton Bradley intended to accomplish when it asked appellants to sign its Disclosure Record forms.[3]

Milton Bradley argues that its disclosure form waives, as a matter of law, any duties or obligations it might owe to appellants other than those under the patent laws. The language of the form, it asserts, clearly disclaims "any relationship" between it and appellants which includes *a fortiori* Milton Bradley's refusal to establish a confidential relationship. Milton Bradley reasons, therefore, that appellants' claim of misappropriation must fail. Finding this argument persuasive, the district court concluded that there was no issue of fact to submit to the jury regarding the parties' understanding of the disclosure agreement.

What makes the issue so close a question in this case is the use of undifferentiated or general terminology. We begin our analysis, therefore, recognizing that the disclosure agreement in the case at bar cannot stake a claim to a clearly "express disclaimer". A widely quoted statement of the law in such a case is the following:

"[A] disclosure expressly received in confidence may create a confidential relationship. Conversely, express disclaimer by the disclosee of a confidential relationship from the outset will dispel the existence of such a relationship." Milgrim, *Trade Secrets* § 4.03 at 4–18, citing

*Crown Industries, Inc. v. Kawneer Co.*, 335 F.Supp. 749, 754–755 (N.D.Ill.1971).

In *Crown Industries v. Kawneer*, 335 F.Supp. at 754, the plaintiff's agreement to the conditions of submission for review of his idea precluded the formation of a confidential relationship. The Kawneer Company policy booklet explicitly stated:

"1. No confidential relationship is to be established by such submission or implied from consideration of the submitted material, and the material is not to be considered to be submitted 'in confidence.' (Confidential relationships have been held to create obligations which are beyond those that the Company is willing to assume.)"

Similarly, in *Kearns v. Ford Motor Co.*, 203 U.S.P.Q. at 886, the plaintiff signed an equally unambiguous form entitled "CONFIDENTIAL DISCLOSURE WAIVER" which contained language to the effect that "Ford Motor Company cannot receive suggestions in confidence." The court in *Kearns* concluded that plaintiff's right to rely on an implied confidential relationship, to the extent it was shown to exist under the circumstances, was effectively terminated upon signing the waiver form. In both cases, therefore, the explicit waivers barred plaintiff's recovery for misappropriation of trade secrets. *Id.* at 888–889; *Crown Industries v. Kawneer*, 335 F.Supp. at 762; *see also, Van Rensselaer v. General Motors Corp.*, 223 F.Supp. 323 (E.D. Mich.1962), *aff'd*, 324 F.2d 354 (6th Cir. 1963); *Zaidan v. Borg-Warner Corp.*, 228 F.Supp. 669, 670–671 (E.D.Pa.1964), *aff'd*, 341 F.2d 391 (3d Cir.1965).

---

3. The disclosure agreement, which is reproduced in full in the district court's opinion, *Burten v. Milton Bradley Co.*, 592 F.Supp. at 1025–1026, states in relevant part:

"I submit my idea or item voluntarily and I understand that this submission by me and its acceptance by Company does not, in whole or in part, establish or create by implication or otherwise any relationship between Company and me not expressed herein. I further understand and agree that Company, in its own judgment, may accept or reject the idea or item submitted and shall not be obligated to

me in any way with respect to my idea or item until Company shall at its own election enter into a properly executed written agreement with me and then only, according to all of the terms of said agreement. If no agreement is concluded, I shall rely solely upon such rights as I may have under U.S. Patent laws....

"I further agree that Company may photograph, xerograph or otherwise reproduce for its records only any material submitted by me herewith or subsequently with respect to said idea or item whether accepted or rejected."

In contrast to the language of the above agreements, the Milton Bradley disclosure agreement contains no explicit language regarding waiver of a confidential relationship. Nor is it, as appellee contends, "almost identical" to the disclaimers appellants signed with Parker Brothers Games ("this suggestion is not submitted in confidence") and the Western Publishing Company ("disclosures ... are not received or held on a confidential basis") in which the signing party's waiver of a confidential relationship is clearly addressed. By the same token, we cannot accept the district court's equating the instant agreement with those of Parker and Western as "a like disclaimer". *Burten v. Milton Bradley*, 592 F.Supp. at 1032. Indeed, as we show below, the absence of an express disclaimer at best conveys an ambiguous message as to whether the agreement covers confidential relationships.

We do not dispute Milton Bradley's assertion that its form may credibly be read to waive all relationships and obligations between the parties, including a confidential relationship. So, however, can it equally be understood to address only the relationship between the parties during Milton Bradley's review procedure. The agreement clearly puts appellants on notice that they are not entitled to remuneration from Milton Bradley merely upon submission of Triumph, but it does not adequately apprise them of the rights and obligations of the parties upon Milton Bradley's affirmative use or appropriation of the ideas submitted.

In its decision denying appellee's motion for a directed verdict, the district court found the disclosure agreement to be an explict waiver of all *contract* rights between the parties. The court was concerned, however, that the disclosure did not carry equal force with respect to a confidential relationship because such relationship provides the basis for an action in *tort.* The court suggested that the language necessary to waive contractual obligations may not be sufficient to disclaim tort liability for the misappropriation of trade secrets. Although the district court, after

trial, reached a different conclusion, we find merit in this analysis.

■ Under Massachusetts law, parties cannot easily contract out of liability for tortious behavior. It is, for example, clearly against public policy for one party to attempt to exempt itself from liability for its own gross negligence or its own misrepresentations. Restatement (Second) of Contracts §§ 195, 196 (1981); *Gillespie v. Papale*, 541 F.Supp. 1042, 1046 (D.Mass. 1982). Significantly, even where Massachusetts has permitted individuals to contractually disclaim liability for mere negligence, the language of the disclaimer has been clear and unambiguous to that effect. *Barrett v. Conragan*, 302 Mass. 33, 18 N.E.2d 369 (1938); *see also Henry v. Mansfield Beauty Academy, Inc.*, 353 Mass. 507, 510–511, 233 N.E.2d 22 (1968); *Ortolano v. U-Dryvit Auto Rental Co.*, 296 Mass. 439, 6 N.E.2d 346 (1937); *New England Watch Corp. v. Honeywell, Inc.*, 11 Mass. App.Ct. 948 (1981); *Schell v. Ford Motor Co.*, 270 F.2d 384, 386 (1st Cir.1959); *Gillespie v. Papale*, 541 F.Supp. 1042. The Milton Bradley disclosure form, in contrast to those in the above cases, conspicuously lacks language which explicitly disclaims tort liability. Absent such clear language, we think that a jury could reasonably read "relationship" as it is used in the Milton Bradley form to embrace only those ties and obligations established by consensual understanding or course of dealing (under contract principles) and not those legal constructs which may be triggered by unanticipated, covert, and devious misuse.

■ Moreover the apparently clear waiver language of one paragraph of the Milton Bradley form is muddied by additional language also contained in the agreement. We refer specifically to two segments of the agreement, a handwritten addendum to the first disclosure form signed by appellants, and the clause authorizing reproduction of the submitted prototype. The handwritten notation on the disclosure form, as explained by a Milton Bradley executive, reflects Milton Bradley's agreement to pay a non-refundable $25,000 advance against

future royalties if it holds the game longer than 30 days. For each additional thirty days that Triumph is in Milton Bradley's possession, Milton Bradley will advance another $25,000.[4]

We believe that the handwritten addendum modifies several terms of the written agreement. Although the disclosure form calls for the waiver of all obligations and relationships between the parties, the addendum indicates Milton Bradley's willingness to assume an obligation to return Triumph to appellants within a designated time period. Similarly, while the disclosure agreement ostensibly denies appellants all recourse against Milton Bradley except that available under the patent laws, the addendum clearly authorizes appellants to receive royalties from Milton Bradley if the company fails to meet its obligation to return Triumph within the requisite time period. In light of this agreement to compensate appellants for the "honorable" holding of Triumph should it extend beyond thirty days, a jury could reasonably conclude that appellants had not waived any claim to royalties for the "dishonest" holding or use of Triumph.

In addition, by the terms of the so-called xerox clause contained in the disclosure agreement, Milton Bradley is authorized to photocopy or otherwise reproduce material submitted *only* for its records. A jury could reasonably conclude from the limiting language of this clause that Milton Bradley promised confidentiality in the handling and use of Triumph while the game was in its possession. We note further that neither the Parker Brothers nor the Western Publishing forms, which explicitly disclaim confidential relationships, contain similar language.

On its face, then, we find that the disclosure agreement falls short of an unambiguous waiver of all rights in Triumph and does not, as a matter of law, bar appellants' action for misappropriation. The jury, therefore, was correctly allowed to consider evidence outside of the form to fairly assess the meaning of the agreement and the intent of the parties in signing it. A. Corbin, 3 *Corbin on Contracts* § 579 (1960) (parol evidence admissible to clarify ambiguous contract).[5]

The district court reached a similar result in *Houser v. Snap-On Tools Corp.*, 202 F.Supp. 181 (D.Md.1962), when it analyzed a disclosure agreement which is comparable to the Milton Bradley form.[6] In that case, although plaintiff's action for misappropriation ultimately was unsuccessful, the district court concluded that the signing party had not waived all rights other than those based on the patent laws. The court doubted whether such a document "would give a manufacturer the right to expropriate a disclosure without remuneration, where the course of dealings between the parties indicates ... that the disclosing

---

4. The handwritten entry states:
   Monday, March 31 30—$25,000
   every 30 days + 25,000
   until contract is signed
   "      "    "      "

5. Of particular relevance was evidence introduced at trial which established that Milton Bradley fostered the expectation of confidentiality in a number of ways. In the words of the district court, there was:
   "an industry-wide custom among reputable game and toy companies to maintain the secrecy of ideas submitted by outside inventors and to use innovations only if royalties were paid to the inventor. The evidence further showed that not only did [Milton Bradley] adhere to this custom, but it fostered such an understanding with outside inventors. High-level [Milton Bradley] executives testified that

the industry, as well as virtually all the independent professionals, shared this expectation." *Burten v. Milton Bradley Co.*, 592 F.Supp. at 1027.

6. In *Houser*, the plaintiff was allowed to submit an idea for a new type of socket wrench after agreeing that:
   "2. No obligation of any kind is assumed by, nor may be implied against, [Snap-On Tools] unless or until a formal written contract has been entered into and then the obligation shall be only such as is expressd in the formal written contract.
   3. This preliminary disclosure arrangement in no way extends to nor affects the rights provided under the patent laws of the United States except as such may be embodied in a formal written contract between the parties." *Id.* at 184.

party was seeking remuneration for the use of his creation." *Id.* at 184; *see also Moore v. Ford Motor Co.,* 43 F.2d 685 (2d Cir.1930), *aff'g* 28 F.2d 529 (S.D.N.Y.1928).

The reasons which have led us to conclude that the Milton Bradley disclosure agreement is ambiguous insofar as a waiver of confidential relationship is indicated also lead us to find unpersuasive the few cases which equate disclaimers like the present one, or that discussed in *Houser v. Snap-On Tools,* with the explicit waiver of a confidential relationship found, for example, in *Kearns v. Ford Motor Co.,* 203 U.S.P.Q. 885. *Hisel v. Chrysler Corp.,* 94 F.Supp. 996 (W.D.Mo.1951); *Boop v. Ford Motor Co.,* 177 F.Supp. 522 (S.D.Ind.1959), *aff'd,* 278 F.2d 197 (7th Cir.1960). Moreover, there are policy considerations that militate against reading ambiguous disclosure forms to disclaim tort liability.

The underlying goal of the law which protects trade secrets, like that which protects copyrights and patents, is to encourage the formulation and promulgation of ideas by ensuring that creators of ideas benefit from their creations. *Jet Spray II,* 377 Mass. at 166–167, 385 N.E.2d at 1354–1355. Massachusetts encourages the protection of trade secrets not only because the public has a manifest interest in commercial innovation and development, but also because it has an interest in the maintenance of standards of commercial ethics. *Id.* Fundamental to this, we believe, is the expectation by the parties that, absent an explicit waiver, the exchange of ideas will take place in trust and confidence. Were this not the case, we are hard pressed to understand why experienced and informed inventors would submit their ideas for consideration and thereby waive all rights to compensation for their labor.

We fully recognize that a manufacturer may wish to insulate itself from claims of misuse of materials submitted in confidence, whether founded on fact, fantasy or coincidence. This objective may be clearly realized by the kinds of explicit waivers we have noted in the same industry. We see no ponderable burden attached to requiring such explicitness.

The effect of the disclosure form on the relationship between the parties was therefore a factual question appropriately submitted to the jury at the conclusion of the trial. Finally, we believe that there was sufficient evidence before the jury for it to find for the appellants. We rely on the district court's review of the facts to support our conclusion:

> "Succinctly put, the jury had evidence before it that the plaintiffs' approach was a novel one, that they were the instrument of [Milton Bradley's] enlightenment as to the concept, and that they expected [Milton Bradley] to honor both their revelations and their proprietary interest. Most salient, the jury could well have inferred ... that [Milton Bradley] plagiarized the plaintiffs' idea without so much as a by-your-leave.... It suffices to say at this juncture that, if a higher tribunal should hereafter declare that the case was properly entrusted to the tender ministrations of the finders of the facts, then no miscarriage of justice would result from the imposition of liability. And, the size of the compensatory damage award is plainly responsive to the evidence of putative royalties." *Burten v. Milton Bradley Co.,* 592 F.Supp. at 1038.

Finding all remaining arguments unpersuasive, the judgment of the district court is,

*reversed.*